## SUTLIFF *v.* DAYTON.[1]

SALE—SPECIFIC PERFORMANCE—FRAUDULENT APPRAISAL OF GOODS.
Complainant agreed to sell a stock of goods to defendant, and take in payment certain real estate at specified prices. The goods were to be invoiced at cost, as shown by the bills, except such as were damaged or shopworn. Each party selected an appraiser. Complainant and his clerks assisted in making the inventory, and the quantity of the goods was determined by them. The invoices were not produced, but complainant represented that the cost price was attached to each article, and the inventory was made upon that basis. Shortly after taking possession of the stock, and before a final settlement, defendant became dissatisfied, and demanded a new appraisal, which was refused. Defendant thereupon had the stock reappraised by three experienced, disinterested persons, having first notified complainant to be present and produce his bills, with which request complainant did not comply. This appraisal was based upon an estimate of the cost of the goods, except as to those damaged,

---

[1] Rehearing denied December 30, 1895.

which were invoiced at their present value; and the total valuation of the stock was shown to be much less than by the former inventory. In a suit for specific performance, it appearing that complainant had raised the cost mark on the goods, altered and arranged them so as to conceal damage and shop wear, and misrepresented the quantity to the appraisers, it was *held* that defendant was not concluded by the original inventory, but should be charged with the amount of the second appraisal only. GRANT, J., dissenting.

Appeal from Ingham; Person, J.    Submitted April 17, 1895. Decided July 9, 1895.

Bill by Charles H. Sutliff aganst George M. Dayton for the specific performance of a contract.    Defendant appeals.   Decree modified.

*S. L. Kilbourne,* for complainant. .

*M. V. Montgomery,* for defendant.

McGRATH, C. J.   This is a bill to compel the specific performance of a contract dated December 21, 1892, whereby complainant agreed to sell to defendant two stocks of merchandise, one located at Lansing and the other at Mt. Pleasant, consisting of millinery and ladies' and gents' furnishing goods.   It was provided that all goods should be invoiced "at the actual cost, as shown by bills, except such as are damaged or shopworn; all untrimmed hats at $1.50 per dozen, and the trimmed hats at one-half the retail price; the furniture at prices as agreed upon verbally between the parties."    It was further agreed that complainant was to take in payment two houses and lots, one at $6,500 and the other at $6,000; and that, "if said stocks shall invoice over the amount of the two terraces as above written, he shall take as payment for said amount, over the $12,500, any real-estate property belonging to said Dayton, at his list price."

Complainant selected one Brisbin, and defendant one Watrous, to inventory the stocks.   Watrous knew very little about the millinery business.   Complainant, his

wife, son, and clerks, assisted in making the inventory, which was completed about January 4, 1893. The inventory of the stock at Lansing amounted to $18,409.98, and that of the Mt. Pleasant stock to $3,125.37, making a total of $21,535.35. Pending the inventory, defendant conveyed to complainant the houses and lots specifically referred to in the contract, and, upon the completion of the inventory, defendant took possession of the stocks of goods. Shortly thereafter, and before anything further was done respecting a final settlement under the contract, defendant became dissatisfied with the inventory, and, in writing, demanded a new appraisal. Complainant did not respond.

On January 30, 1893, defendant wrote to complainant as follows:

"I wrote you I should insist on a new invoice. Unless you call to-day, and make some arrangement in regard to it, I shall get competent parties, and proceed at once to take invoice."

Again, on February 3, 1893, defendant wrote as follows:

"Since the inventory, or pretended inventory, * * * I have found many discrepancies between the inventory and measurements and cost; so many as to make it certain that there have been either serious mistakes made, or fraud practiced upon me. The difference between the value of the goods upon the basis which they were to be valued by our contract, and the aggregate of the inventory value by this pretended inventory, is, in my judgment, very large. I propose to employ disinterested and thoroughly competent men to take a correct inventory of these stocks at an early date. I much desire to avoid litigation with you, and invite you to be present at and participate in such inventory. A correct account of sales has been kept, so that no trouble need be anticipated in making an absolutely correct statement. Will you kindly indicate whether or not you will join in or be present at such an inventory, and, if so, at what early date it would best suit your convenience to have the inventory commence?"

On February 13, 1893, defendant wrote again:

"To-morrow (Tuesday) morning, at 10 o'clock, I shall be ready to proceed with the invoice mentioned and proposed by me in my last communication to you. I hereby request you to be present personally, or by some representative, to witness or participate in it, as you may elect. Please produce all bills which you may have on hand, so that we may use them on said invoice."

Complainant made no response to any of these communications. Defendant then selected three appraisers from the city of Jackson,—one who had been in the millinery business for 12 years, another who had been in that business since 1856, and the third had been in the dry-goods business for 18 years. The inventory made by these gentlemen of the Lansing stock footed up $11,128.71, and of the Mt. Pleasant stock $2,269.52, making a total of $13,398.23, and the sales in the meantime amounted to $336.92, making a grand total of $13,735.15. These gentlemen did not inventory the goods at their estimate of present value, nor at the cost as marked upon the goods, but they testified that they knew what such goods cost, and inventoried them at cost, except as to damaged goods, and, as to those, they appraised them at present values.

It is insisted by complainant that, each party having selected a representative to take the inventory, both are concluded by the inventory so taken. The contract, however, provided that the goods were to be taken at the actual cost, as shown by the bills, except such as were damaged or shopworn; the untrimmed hats at $1.50 per dozen, and the trimmed hats at one-half the retail price. It is conceded that neither Brisbin nor Watrous saw or referred to the invoices, but complainant represented that each article had upon it the cost mark in characters. Brisbin and Watrous were given the key to the cost mark, and, relying upon the marks, affixed the prices. It also appears that neither Brisbin nor Watrous determined the quantities, but the measurements and counting

were done by complainant and his clerks, and Brisbin and Watrous relied upon the figures given as to quantity. Next, in determining whether goods were damaged or shopworn, Brisbin and Watrous relied upon the general appearance of goods as presented to them in the web or roll. The testimony tends to show that certain of the goods in both stocks had no cost mark upon them when the contract was made; complainant says not over 5 per cent. of the articles. These goods, at least, were marked subsequently, at the instance of complainant. As to certain articles, it is conclusively shown that they were marked at figures largely in excess of the cost or the selling price. It is undisputed that, pending this inventory, complainant, his wife, his son, and a daughter, together with a force of clerks, were at work in both stocks of goods, preparing them for this inventory, marking such as were not marked, measuring velvets, silks, laces, ribbons, etc., counting ornaments and other things, cutting off damaged or shopworn ends of goods, rewinding ribbons, etc., and that the employés had been instructed by complainant to cut off the damaged or soiled or shopworn parts or ends of ribbons, silks, and other goods, and, in rewinding the ribbons, to wind the outside in, which was done. It further appears that a letter was written by complainant to his daughter at Mt. Pleasant, telling her, among other things, to mark certain pattern hats (the highest retail price of which was $7.50, and which the clerks had been instructed to sell for $5 rather than lose a sale) up to $10, and they were so marked, and charged up to the defendant at $5 each, or one-half of the figure so put upon them. Testimony was offered clearly tending to show that the marks upon other goods had been erased, and raised cost and retail prices had been put upon them, which were made the basis for the inventory; that the cost price of plumes had been raised from $2.50 per dozen to $6; that retail prices on hats were raised from $6.25 to $7.50, from $2.50 to $4, and from $3.50 to $5; that in one instance, while Bris-

bin and Watrous were in one part of the store, engaged with the inventory, complainant and a clerk were in the show room in the silk department, at the other end of the store, putting the "cost mark" upon silks, and complainant told the clerk not to say anything about the marking, or, if he saw any marking done, not to mention it; that the party who had charge of the hat trimming department kept a book in which, as each hat was trimmed, she entered the cost, and gave to each a number, and pasted into the hat a corresponding number, and that, pending the inventory, the numbers in the hats were removed; that extensions were made upon the book in which the inventory was made, during its progress, by complainant, in the absence of both Brisbin and Watrous; that a shortage was afterwards found in the measurements of 75 pieces of velvet; and that, in one instance, three yards and three-quarters had been cut from a bolt of expensive velvet, and the end had been sewed to the bolt, as though it had been untouched; and it was shown that during the inventory this piece of velvet had been taken from the store to complainant's house, and returned. It is admitted by complainant that he burned up his books of account and his invoices, and that, but for such destruction, he could have produced the bills of all the goods in stock. He claims that the burning was done after the completion of the inventory, but he is contradicted in this, for Brisbin testified that he was informed by complainant, several days before the completion of the inventory, that the bills and books had been destroyed. Complainant denies that he wrote to his daughter to mark up the hats, but they were actually marked up, and two or three of his own clerks testify to the receipt of such a letter.

The following questions, put to complainant on cross-examination, and the answers thereto, need no comment:

"Q. Did you not yourself, for the express purpose of imposing upon Mr. Dayton, change the marks on goods

after you made this contract, and mark them above the original cost?

"*A.* Not that I know of.

"*Q.* You would be likely to forget such a circumstance?

"*A.* Well, I think I would."

It would seem unnecessary to comment upon the facts here presented. Defendant would undoubtedly be bound by the valuation placed upon these stocks of goods, in the absence of testimony throwing discredit upon cost price, quantity, and character of the goods. The cost of such goods as were to be taken at cost was to be ascertained from the bills. The bills were not produced, but were destroyed. Complainant represented that the goods contained the cost mark. The gentlemen selected to make the inventory relied upon complainant's representations, both as to cost and quantity. They further relied upon the appearance of the goods as presented to them in the course of the inventory. Defendant is not concluded because of what these gentlemen did in reliance upon the representations made to them by complainant, when it appears that misrepresentations and deceit were used by him; no more so than if he had procured and presented to them bills which misrepresented the cost of the goods. If is not the errors in judgment of the appraisers that defendant complains of, but the active misrepresentations made by complainant.

The defendant agreed to take these goods as they then stood, the shopworn and damaged goods at the estimate of value placed upon them in their then condition. It could not have been contemplated either that certain of the goods were to be trimmed down, or that their shopworn or damaged character was to be concealed. A large portion of such a stock of goods ordinarily consists of articles which are not regarded as staple. The value of goods depends upon their salability. Goods often become shopworn because they have met with a tardy sale. That portion of a web or bolt of goods which has been exposed,

and becomes shopworn in consequence, is an index as to age, and to the character as to salability of the whole piece. Deception seems to have been practiced not only as to the cost and retail price, but as to quantity and quality as well. Under such circumstances, defendant is not concluded by the inventory. Enough was shown to discredit that inventory. Defendant, as soon as he learned of the deception, demanded an inventory in accordance with the contract. He finally demanded the invoices, so that an inventory might be made upon the contract basis. Complainant refused to furnish them. Defendant then procured an appraisal to be made of the stock. The appraisers, so far as was possible, based their figures, as to goods not damaged or shopworn, upon the cost when purchased. As to damaged or shopworn goods, we have the judgment of three disinterested and competent parties. It is insisted by complainant that, at the hearing, he had, in a number of instances, procured duplicate bills, and submitted them, but no attempt at comparison appears in the record. Complainant took the position there that is taken here, that the inventory as first made concluded the defendant.

Complainant is entitled to be credited with the value as fixed by the last appraisal, adding the amount of sales made in the meantime, and should be charged with the value of the property conveyed to him at prices agreed upon. Defendant should be charged with the amount of said appraisal and the sales aforesaid, and have credit for the agreed value of the real estate conveyed. Complainant will have a decree for the difference, the same to be satisfied in the manner provided for in the contract. Defendant will be entitled to the costs of this court. A decree will be entered accordingly.

LONG, MONTGOMERY, and HOOKER, JJ., concurred with McGRATH, C. J.

GRANT, J. (dissenting). For about 12 years prior to 1893, complainant had been engaged in a wholesale and

retail millinery business in the city of Lansing. Defend-
ant was a speculator and dealer in real estate, and was
the owner of several houses in the city of Lansing; had
also been engaged in merchandising in a store directly
opposite that of complainant; and had bought and sold
many stocks of goods, consisting of clothing, hardware,
and drugs. Negotiations were entered into between them
for the exchange of the millinery stock for certain real
estate of the defendant. Defendant, desiring to make
the trade, made the following written proposition to the
complainant:

"Three east terraces, for $18,500, finished according to
contract. Will take both stocks of goods as agreed upon.
If any difference coming to me, will take mortgage back
on two east terraces. Or will trade two west terraces
for $12,500, and, if stocks come to more than terraces, will
pay in wild lands at my list price. Or will trade 200 acre
farm, at $62.50 per acre, and one terrace, for stocks, or
northern lands for difference on stocks and farm."

This proposition was not accepted, but was followed
by a written agreement, dated December 21, 1892, as
follows:

"The said Charles H. Sutliff, party of the first part,
agrees to sell to George M. Dayton his stock of merchan-
dise situated at store No. 222, Washington avenue
north, Lansing, Michigan, and his stock of merchandise
at Mt. Pleasant, Michigan. Said stocks consist of mil-
linery and ladies' and gents' furnishing goods and store
fixtures. Said goods are to be invoiced in the following
manner: All goods at the actual cost, as shown by bills,
except such as are damaged or shopworn; all untrimmed
hats at $1.50 per dozen, and the trimmed hats at one-half
the retail price; the furniture at prices as agreed upon
verbally between the parties. The said first party also
agrees to take as payment the following property: The
terrace on the corner of Shiawassee and Seymour streets
at $6,500, and the terrace adjoining on the east at $6,000.
Said buildings are to be completed according to contracts
now made by said Dayton. The said first party also
agrees that, if said stocks shall invoice over the amount
of the two terraces as above written, he shall take as

payment for said amount, over the $12,500, any real-estate property belonging to said Dayton, at his list price. The said George M. Dayton agrees to buy said stocks, and to pay for them as agreed upon and in the manner aforesaid, and to give a full warranty deed for said terraces upon the fulfillment of said first party, as agreed by him to be done. It is also agreed between the parties that said invoice shall begin on the 22d day of December next, and completed as soon as possible; also, that the damaged or shopworn goods are to be invoiced at actual value when invoiced."

On the same day the two terraces were conveyed by deed to complainant. An invoice was immediately taken pursuant to this agreement; the defendant choosing a Mr. Watrous to act for him, and the complainant a Mr. Brisbin. The defendant was present, more or less, every day during the taking of the invoice, although he trusted it mainly to Mr. Watrous. Mr. Watrous had been employed on previous occasions by him to fix the value of other stocks of goods which he had purchased. He testified that he relied upon his judgment to fix the value of the goods now in controversy. The testimony on the part of the complainant showed that his judgment was generally accepted in case of a dispute. They were assisted by the clerks in the store, and were occupied two weeks in making the invoice and appraisal. The invoice of the Lansing stock amounted to $18,409.98; that of the Mt. Pleasant stock to $3,125.37.

After the invoice was completed, and on January 9, 1893, they executed the following supplemental contract:

"Balance of property to be taken by C. H. Sutliff on goods: He is to take two terraces, out of the three east ones, of the west five; the inside ones at $6,000 each, and the end one for $6,500. They are to be finished as per contract given. Sutliff is to give Dayton mortgage of $2,000 on each terrace, payable in three years, interest at 7 per cent. semi-annually. If goods should amount to more than terraces, Sutliff is to take real estate at list price."

The stocks were immediately delivered to Mr. Dayton,

who took possession, transferred the Mt. Pleasant stock to Lansing, and commenced selling. He, in fact, took possession of the store and the goods at Lansing upon the execution of the first contract.

February 3, 1893, he wrote complainant the following letter:

"Since the inventory, or pretended inventory, of the two stocks of merchandise which I, on the 21st of December, contracted to purchase of you, the one at No. 222, Washington avenue north, Lansing, Michigan, and the other stock at Mt. Pleasant, Michigan, I have found many discrepancies between the inventory and measurements. and cost; so many as to make it certain that there have been either serious mistakes made, or fraud practiced upon me. The difference between the value of the goods upon the basis which they were to be valued by our contract, and the aggregate of the inventory value by this pretended inventory, is, in my judgment, very large. I propose to employ disinterested and thoroughly competent men to take a correct inventory of these stocks at an early date. I much desire to avoid litigation with you, and invite you to be present at and participate in such inventory. A correct account of sales has been kept, so that no trouble need be anticipated in making an absolutely correct statement. Will you kindly indicate whether or not you will join in or be present at such an inventory, and, if so, at what early date it would best suit your convenience to have the inventory commence?"

To this letter complainant paid no attention. February 13th he again wrote complainant:

"To-morrow (Tuesday) morning, at 10 o'clock, I shall be ready to proceed with the invoice mentioned and proposed by me in my last communication to you. I hereby request you to be present personally, or by some representative, to witness or participate in it, as you may elect. Please produce all bills which you may have on hand, so that we may use them on said invoice."

To this no reply was made. Thereupon defendant procured three men from Jackson, who were engaged in the millinery business, to appraise the stock. These parties appraised the stock at $13,398.23. Defendant's testimony

showed that he had sold goods to the amount of only $336.92 during the period of six weeks prior to the appraisal made by the men from Jackson.

Upon the refusal of the defendant to carry out the contract upon the basis of the original appraisal and invoice, the complainant filed this bill to enforce the specific performance of the contract. The defendant answered, admitting the material allegations of the bill, except those relating to the value of the stock. The allegation of the answer on which the defense is based is that "the damaged and shopworn goods were invoiced largely above their actual value, and goods not damaged or shopworn at prices largely in excess of their actual cost," and that the aggregate value was $13,398.23. Proofs were taken in open court, and decree entered for complainant.

It is not claimed that any false representations were made by complainant as to the character or value of the stock. No fraud is alleged in the answer. The contract is clear and specific. The only thing left undetermined was the manner of arriving at the value of the damaged and shopworn goods. This, however, was supplied by the agreement choosing Mr. Brisbin on the part of the complainant, and Mr. Watrous on the part of the defendant, to take the inventory and make the appraisal. Their judgment was final, in the absence of fraud or mistake. They were furnished every opportunity for the examination of the goods, aided by the clerks who had been in Mr. Sutliff's employ, and were familiar with them. The goods were accurately measured, and those invoiced as undamaged were inventoried at cost price, as required by the contract. No fraud is alleged or claimed in making this inventory. The learned counsel for the defendant says in his brief: "In conclusion, I have only to suggest that happily this case can be disposed of justly and properly without imputing intentional fraud to anybody." He further says in his brief: "One of three things must be true: *First*, quantities were exaggerated, and goods invoiced which were not present; or, *second*, undamaged

goods were invoiced above cost; or, *third*, a large amount of goods which were, as matter of fact, damaged and shopworn, were invoiced as undamaged. Probably, all these things are true to a degree."

There is no evidence to sustain either the first or second proposition. An attempt was made to show a shortage in the measurement of some velvets, of which there were about 75 pieces. Some time after defendant had been in possession, one of his clerks measured one piece of this velvet, and claimed that she found it 3¾ yards short. She then measured the rest of the velvets. Neither she nor defendant kept any account of the amount of the shortage. She testified that 8 out of every 10 pieces were short from a quarter of a yard to 4 yards. She also testified that a few pieces ran over a little. This is all the evidence of any shortage, although defendant had other goods measured. This testimony is too indefinite to justify a finding of shortage or any deduction in consequence thereof. When a party complaining has it in his power to give accurate figures, he cannot call upon a court for relief upon mere conjecture.

Neither is there any evidence that undamaged goods were invoiced above cost. Mr. Sutliff was nearly blind, and did no marking himself. The testimony is conclusive that the cost marks were placed upon the tags attached to the goods. Furthermore, some original and duplicate bills of purchases were produced upon the hearing in the court below, and no claim is made that they do not correspond with the marks upon the tags.

It follows that the defense rests solely upon the question whether there was a mistake in invoicing damaged and shopworn goods as undamaged, and in placing values upon them. It is evident that the parties making the first inventory and appraisal had better opportunities for making examination than did those making the second. The former were occupied 14 days, and saw the goods as they were measured. The latter were occupied only two days, and evidently had no opportunity to make

a thorough and minute examination. They were shown the contract, and testified that they made their estimates as nearly as possible under the terms of the contract as they understood it. They paid no attention to the cost marks upon the tags, but were guided solely by their own recollection and judgment as to what the goods "ought to have cost." It requires no argument to show that this was not in accordance with the contract. That was for the cost to Mr. Sutliff, not what other parties might have bought the same goods for, or what they believed they ought to have cost. The testimony on the part of the complainant was that about one-third of the goods was estimated as damaged or shopworn. One of the defendant's appraisers placed the amount of damaged goods at about the same. A few figures in this respect are instructive. The total of the first appraisal was $21,- 535.35. Of course, the cost price would be in excess of this; but if we assume this to be the aggregate cost price, and deduct one-third for damaged goods, it would leave the amount of the undamaged goods to be taken by the contract to be $14,356,—almost $1,000 greater than the valuation placed upon the entire stock by the second appraisal.

Briefly stated, the situation is this: The parties agreed upon a sale at $21,535.35. The goods were delivered, and defendant went into possession, and carried on the business for six weeks. The defendant asks the court to deduct from this $7,800.20, upon the judgment of three men that the stock was worth less than the agreed price by that amount, and to substitute the judgment of these men for the judgment of those agreed upon by both parties, and this without any offer on the part of defendant to rescind the contract. The witnesses were before the court, which had therefore a better opportunity to judge of their candor and truthfulness, and to determine how much credence to repose in them, than we have. To justify a reversal of the case upon the facts under these circumstances, there must be a clear preponderance of

evidence in favor of the appellant. This court has frequently so held. So, also, have other courts. *Montgomery* v. *Pickering*, 116 Mass. 230. Courts of equity cannot relieve from foolish and hard bargains. The contract proved must be enforced, and no relief can be granted except in cases of fraud or mistake.

The decree should be affirmed, with costs.